**David Rowe ASHBY, Appellant**

v.

**The STATE of Texas, Appellee**

**NO. 01-15-00182-CR**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued May 23, 2017

Matthew J. DeLuca, 712 Main St., Suite 2450, Houston, Texas 77002, Tyler Flood, 1229 Heights Blvd., Houston, Texas 77008, for Appellant.

Kim Ogg, District Attorney—Harris County, 1201 Franklin, Suite 600, Houston, TX 77002, Jessica Akins, Assistant District Attorney, Harris County, Texas, 1201 Franklin, Suite 600, Houston, TX 77002, for Appellee.

Panel consists of Justices Jennings, Massengale, and Huddle.

## OPINION

Rebeca Huddle, Justice

Appellant David Rowe Ashby was charged by information with and, during a jury trial, pleaded guilty to the misdemeanor offense of driving while intoxicated. There was no plea bargain or punishment recommendation by the State. The trial judge released the jury and sentenced Ashby to 180 days' confinement, probated for one year, and a $1,000 fine. In two issues, Ashby contends that the trial court erred in (1) denying his motion to suppress the traffic stop and (2) admitting expert testimony regarding the presence of a controlled substance in Ashby's blood. We affirm.

## Background

The State introduced testimony at trial from the arresting officer, Deputy T. Gossett. At approximately 7:40 a.m., the Toll Road Dispatch received a call reporting that a black SUV traveling northbound struck a wall while crossing the toll bridge over the Ship Channel and continued driving. Deputy Gossett was already at a nearby toll plaza. According to Deputy Gossett, dispatch informed him that the vehicle had stopped at the toll plaza, and at that point, he observed a black SUV leaving the toll plaza. Deputy Gossett began following the black SUV—Ashby's SUV—with his dash cam recording. Gossett testified that he observed the vehicle weaving within the lanes, crossing the shoulder line, and nearly striking a concrete barrier.

Deputy Gossett initiated a traffic stop, and the driver identified himself as David Ashby. Deputy Gossett testified that Ashby wore a soiled gray sweater, and Gossett believed the sweater was likely soiled by vomit. Deputy Gossett testified that he believed he smelled an odor of alcohol on Ashby. He noted that Ashby's eyes appeared glassy. As Ashby tried to get his driver's license out of his wallet, Deputy Gossett noted that Ashby's movements were slow and deliberate. Suspecting that Ashby was intoxicated, Deputy Gossett asked him to step out of the vehicle. In response to Deputy Gossett's questioning, Ashby explained that he had not eaten since the previous day and had been awake all night. Ashby denied drinking alcohol prior to driving, and Deputy Gossett did not find any alcoholic containers in Ashby's vehicle.

Deputy Gossett proceeded to administer three standardized field sobriety tests: Horizontal Gaze Nystagmus ("HGN"), Walk and Turn, and One-Legged Stand. Deputy Gossett explained at trial that in administering the HGN test, he looks for a jerking motion of the eye, which, if present, indicates the presence of "a central nervous system depressant-type drug, alcohol, or brain stem injury." Deputy Gossett repeatedly attempted to administer the HGN test, but was unable to complete the test because Ashby was unable to focus on the focal stimulus. Overall, he noted that Ashby was unsteady and appeared to sway during the HGN test.

Next, Deputy Gossett administered the Walk and Turn and One-Legged Stand tests. Both tests are "divided attention tests," meaning that they are designed to test whether an individual is capable of physically performing an action while also having to think about it. Deputy Gossett testified that Ashby performed poorly on the Walk and Turn test and was unable to follow the instructions—he failed to respond to instructions to walk or stop walking and to put his arms by his side.

Deputy Gossett testified that, before administering the One-Legged Stand test, he both provided instructions and demonstrated the test. He explained at trial that he looks for four clues during the One-Legged Stand test: returning a foot to the ground; swaying; using arms for balance; and hopping to maintain balance. Deputy Gossett testified that he observed three clues as Ashby attempted the test: returning a foot to the ground, swaying, and using arms for balance.

Deputy Gossett acknowledged that sleep deprivation could affect an individual's performance on each of these tests and that the tests were not administered on a flat surface, which is ideal. Nevertheless, based on Ashby's slow, deliberate movements, his poor performance on the field sobriety tests, and his inability to follow instructions, Deputy Gossett determined that Ashby did not have his normal mental and physical faculties, and he placed Ashby under arrest for driving while intoxicated.

Deputy Gossett testified that he suspected Ashby was intoxicated due to alcohol consumption.

Deputy Gossett asked Ashby to submit to a blood sample, and Ashby agreed. A voluntary blood sample was collected at Bayshore Medical Center, and Deputy Gossett personally delivered the blood sample to the Medical Examiner's Office. Analysis of the blood sample showed the presence of Trifluoromethylphenylpiperazine ("TFMPP"), a controlled substance. TEX. HEALTH & SAFETY CODE § 481.103(a)(1).

Ashby objected to the admission of the State's blood analysis. The trial court proceeded to hold a gatekeeper hearing outside the presence of the jury, determined that the State's blood analysis evidence was admissible, and ultimately denied Ashby's objection. Following that ruling and without an agreement as to punishment, Ashby changed his plea to guilty, the jury was excused, and the trial court sentenced Ashby to 180 days in the Harris County Jail, probated for one year's probation, and assessed a $1,000 fine.[1]

## Reasonable Suspicion

In his first issue, Ashby contends that the trial court erred in denying his motion to suppress evidence resulting from the traffic stop. Ashby argues that the stop was not supported by reasonable suspicion because Deputy Gossett never observed Ashby commit a traffic violation and the anonymous call to dispatch was not sufficiently corroborated to justify the stop.

### A. Standard of Review

In reviewing a trial court's ruling on a motion to suppress, we use a bifurcated standard of review to evaluate the totality of the circumstances and determine whether reasonable suspicion exists. *Abney v. State*, 394 S.W.3d 542, 547 (Tex. Crim. App. 2013). First, we must give "almost total deference to a trial court's determination of the historical facts that the record supports," and second, we review *de novo* the trial court's application of the law to facts, which do not turn on credibility and demeanor. *Id.* (citations omitted).

### B. Applicable Law

If supported by reasonable suspicion, an officer may make a warrantless traffic stop. *Guerra v. State*, 432 S.W.3d 905, 911 (Tex. Crim. App. 2014). Reasonable suspicion exists if the officer has "specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity." *Abney*, 394 S.W.3d at 548 (quoting *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001)). "The State does not have to establish with absolute certainty that a crime occurred; it just has to carry its burden of proving that, under the totality of the circumstances, the seizure was reasonable." *Id.*

### C. Analysis

Assuming arguendo that Ashby preserved this issue for appellate review, we conclude that the trial court reasonably determined that the traffic stop was sup-

---

1. At the time of the plea, the trial court entered a certification that this was a plea-bargain case, but matters were raised by written motion filed and ruled on before trial and not withdrawn or waived, and the defendant has the right of appeal. On September 1, 2016, we abated the appeal and issued an order suggesting to the trial court that the certification might be defective. The trial court then filed an amended certification indicating this was not a plea-bargain case, and the defendant has the right of appeal.

ported by reasonable suspicion. Deputy Gossett's testimony at trial established that he was dispatched following an anonymous report that someone driving a black SUV struck a wall while traveling northbound on the toll bridge and continued driving. Deputy Gossett was at the toll plaza when dispatch advised that the black SUV in question was stopped at the toll plaza, and he observed a black SUV leaving the northbound toll plaza. As he followed the black SUV, over a short distance Deputy Gossett observed the driver weaving within lanes, nearly striking a concrete barrier, and straddling lane lines. Deputy Gossett testified that classic signs indicating a driver is intoxicated include weaving within a lane and crossing over lane lines. Having observed classic signs of intoxication, Deputy Gossett initiated the traffic stop.

The record thus shows that Deputy Gossett observed a black SUV like the one that had been reported to dispatch upon his arrival at the toll plaza. But we need not decide whether the anonymous dispatch report provided sufficient justification for an investigatory stop because Deputy Gossett did not rely solely on the anonymous report. Cf. Brother v. State, 166 S.W.3d 255, 258–60 (Tex. Crim. App. 2005) (stop based on facts relayed by citizen caller sufficiently corroborated to justify stop because caller gave detailed description of defendant's car and location, remained in contact throughout incident, and assisted officer in identifying suspect vehicle); Pipkin v. State, 114 S.W.3d 649, 654–56 (Tex. App.—Fort Worth 2003, no pet.) (stop based on facts relayed to law enforcement by citizen caller sufficiently corroborated to justify stop because caller was disinterested but accountable private citizen who provided detailed description). Rather, Deputy Gossett testified that he personally observed erratic driving characteristic of intoxication. This is sufficient to create reasonable suspicion to justify the stop despite the fact that Deputy Gossett did not testify that he observed Ashby commit a particular traffic violation. See, e.g., State v. Alderete, 314 S.W.3d 469, 473 (Tex. App.—El Paso 2010, pet. ref'd) ("[T]here is no requirement that a traffic regulation must be violated in order for an officer to have sufficient reasonable suspicion to justify a stop of a vehicle."); James v. State, 102 S.W.3d 162, 172 (Tex. App.—Fort Worth 2003, pet. ref'd) ("Erratic or unsafe driving may furnish a sufficient basis for a reasonable suspicion that the driver is intoxicated even absent evidence of violation of a specific traffic law."). Based on Deputy Gossett's testimony that he observed Ashby's erratic driving—which is supported by his dash cam video—the trial court reasonably determined that Deputy Gossett had reasonable suspicion to believe that Ashby may have been intoxicated. See Martinez v. State, 29 S.W.3d 609, 611–12 (Tex. App.—Houston [1st Dist.], pet. ref'd) (officer lawfully initiated traffic stop based on defendant's failure to maintain single lane of traffic after observing defendant's car swerve onto shoulder).

Accordingly, we overrule Ashby's first issue.

### TFMPP Evidence

In his second issue, Ashby contends that the trial court erred in allowing the State to introduce evidence that the drug TFMPP was present in his blood sample because the State failed to show that such evidence was relevant and reliable, rendering it inadmissible under Texas Rules of Evidence 702 and 403.

#### A. Standard of Review

Absent an abuse of discretion, a trial court's decision to admit scientific testimony should not be overturned. DeLarue

v. State, 102 S.W.3d 388, 395 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (first citing Wyatt v. State, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000); then citing Morales v. State, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000)). We will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. Layton v. State, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009).

## B. Applicable Law

Under Texas law, a person commits the offense of Driving While Intoxicated "if the person is intoxicated while operating a motor vehicle in a public place." TEX. PENAL CODE § 49.04(a). "Intoxicated" is defined as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body." TEX. PENAL CODE § 49.01(2)(A).

To obtain a conviction for driving while intoxicated, the State must establish "a temporal link between the defendant's intoxication and his driving." Kuciemba v. State, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). A conviction for driving while intoxicated can be supported solely by circumstantial evidence. Id.; Weems v. State, 328 S.W.3d 172, 177 (Tex. App.—Eastland 2010, no pet.). Whether direct or circumstantial, there must be evidence from which a jury could conclude that, at the time of driving, the defendant was intoxicated. Kuciemba, 310 S.W.3d at 462; Weems, 328 S.W.3d at 177; Zavala v. State, 89 S.W.3d 134, 139 (Tex. App.—Corpus Christi 2002, no pet.).

▆▆▆ Generally, all relevant evidence is admissible. TEX. R. EVID. 402. Relevant evidence is that which has any tendency to make the existence of any consequential fact more or less probable than it would be without the evidence. TEX. R. EVID. 401(a). In determining relevance, courts must examine the purpose for which particular evidence is being introduced. Layton, 280 S.W.3d at 240. "It is critical that there is a direct or logical connection between the actual evidence and the proposition sought to be proved." Id.

▆▆▆ If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. TEX. R. EVID. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590–93, 113 S.Ct. 2786, 2795–96, 125 L.Ed.2d 469 (1993); Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001). Before admitting expert testimony, a trial court must determine that (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case. Rodgers v. State, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006). Thus, the trial court must determine that the expert is qualified to testify and the proffered testimony is reliable and relevant. Vela v. State, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).

▆▆▆ The Court of Criminal Appeals set forth the test for assessing the reliability of expert testimony concerning "hard sciences" in Kelly v. State, 824 S.W.2d 568 (Tex. Crim. App. 1992). To be considered reliable under Kelly, evidence derived from a scientific theory must satisfy three criteria: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the tech-

nique must have been properly applied on the occasion in question. *Id.* at 573.

## C. Testimony adduced concerning TFMPP

During trial, Ashby objected to the admission of and moved to suppress the State's evidence showing the presence of TFMPP in Ashby's blood sample and requested a *Kelly* hearing to determine the reliability and relevance of such evidence. The trial court proceeded to hear expert testimony outside the presence of the jury from Doctors Chen, Walterscheid, and Valentine concerning the State's TFMPP evidence.

Dr. Michael Chen, a toxicologist with the Harris County Institute of Forensic Science, analyzed Ashby's blood sample. Dr. Chen testified during the *Kelly* hearing that the method he employed has been subjected to peer review, recently published in the Journal of Applied Toxicology, and is generally accepted in the relevant scientific community. He testified that he followed the accepted protocol in analyzing Ashby's blood and concluded that Ashby's blood tested positive for TFMPP. Dr. Chen did not attempt to quantify the amount of TFMPP present in the sample.

Dr. Walterscheid, Co-Director of Toxicology at the Harris County Institute of Forensic Science, explained that TFMPP is a relatively new designer drug which has not yet been studied in humans. He explained that the drug can produce a psychedelic-like euphoria and has similar properties to cocaine, methamphetamine, and ecstasy. Dr. Walterscheid explained that outward signs of intoxication vary, but that stimulants like TFMPP usually cause excitability, and then later, drowsiness. Dr. Walterscheid explained that it would have been possible to quantify the amount of TFMPP is Ashby's blood sample, but questioned the value of doing so:

We could quantitate it. We have standards to do so, but it's a lot of extra effort for whatever reason—you know, if it was 17, or 70 or 7,000, what difference does it make? Nobody knows exactly what's the fatal amount or toxic amount. We know that it has these properties. We know you shouldn't have it at all. So, it's just better to distinguish present or none detected.

Dr. Walterscheid also testified that—even if TFMPP in Ashby's system had been quantified—he would be unable to reliably extrapolate whether TFMPP was psychoactive at the time of Ashby's arrest given the lack of scientific knowledge regarding TFMPP's effects. However, Dr. Walterscheid testified that the results of Ashby's blood analysis showed the presence of both parent cocaine and the metabolite, suggesting recency of TFMPP use. Based on the half-life of cocaine, Dr. Walterscheid opined that the presence of parent cocaine in Ashby's blood sample suggested that he would have ingested TFMPP near the time of the stop.

Defense expert, Dr. Valentine, also testified concerning TFMPP. Dr. Valentine explained that there are very few studies on TFMPP and that there is little scientific knowledge concerning the absorption, distribution, and secretion of TFMPP in humans. Dr. Valentine testified that without quantifying the level of TFMPP in Ashby's blood, it would not be possible to render an opinion as to time of ingestion or as to whether the TFMPP was affecting Ashby at the relevant time. After watching the video of Ashby driving and performing field sobriety tests, Dr. Valentine opined that Ashby appeared intoxicated by alcohol, and not by a sympathomimetic drug like TFMPP.

After hearing evidence and argument, the trial court concluded that evidence of the presence of TFMPP in Ashby's blood

sample was sufficiently relevant and reliable under Rule 702 and that the prejudicial value of the evidence was not substantially outweighed by its probative value.

## D. Analysis

■ To be deemed reliable under *Kelly*, evidence derived from a scientific theory must meet the following three criteria: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. Here, Dr. Chen explained the underlying scientific theory relied upon to determine whether TFMPP was present or absent in Ashby's blood sample. He offered a detailed abstract explanation of the scientific process used for analyzing the presence or absence of TFMPP in a blood sample. Dr. Chen testified that this technique for blood testing is generally accepted in the scientific community. He further informed the court that the process has been subject to peer review and recently published in the Journal of Applied Toxicology. Asked whether he had followed that same protocol in this instance, Dr. Chen asserted that he followed protocol. This testimony was sufficient to establish the reliability of Dr. Chen's blood analysis and his conclusion that TFMPP was present in Ashby's blood under *Kelly*. *See Bekendam v. State*, 441 S.W.3d 295, 302–04 (Tex. Crim. App. 2014).

■ We further conclude that this evidence was relevant to the question of whether Ashby was intoxicated at the time of his arrest. While reliability concerns the scientific basis for the expert testimony, relevance concerns the "fit" of proffered evidence or testimony to the case. *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996). Whether evidence is relevant depends on whether there is a logical connection between the evidence offered and the proposition sought to be proved by that evidence. *Layton*, 280 S.W.3d at 240. Here, Ashby's arguments concerning relevance collectively challenge whether evidence showing the presence of TFMPP in his bloodstream would assist the trier of fact in understanding the evidence and in making a factual determination regarding whether he was intoxicated where we know little of the pharmacokinetics of TFMPP and where the specific amount of TFMPP in his bloodstream is unknown.

In resolving that challenge, we begin by identifying the proposition sought to be proved by the State's TFMPP evidence: here, TFMPP evidence was offered to show that Ashby's condition at the time of his arrest was caused by the introduction of some substance or combination of substances into his body. The presence of TFMPP in Ashby's blood has a tendency to make it more probable that Ashby did not have the normal use of his mental or physical faculties by reason of the introduction of a controlled substance, or some combination of substances, into his body. *See* TEX. R. EVID. 402; TEX. PENAL CODE §§ 19.01(2)(A), 19.04(a). The failure to quantify the amount of TFMPP in this instance concerns the weight and sufficiency of the scientific evidence, but not its relevance and admissibility.

Ashby cites *Layton v. State*, 280 S.W.3d 235 (Tex. Crim. App. 2009) for the proposition that "without evidence [of] the level of dosage, exact times of ingestion, or the half-life of the drug in the human body, the usage of a particular drug was not relevant to a person's intoxication." *Id.* at 241–42. This overstates the holding in *Layton*, which concerns only the relevance of evidence of use of a particular drug when a defendant faces a DWI charge for consumption of alcohol. *See Layton*, 280 S.W.3d at 241–42. Ashby was charged with driving while intoxicated, but unlike in

*Layton*, the charge was not limited to intoxication by consumption of alcohol. In this case, evidence that TFMPP was present in Ashby's blood sample is relevant because it tends to make it more probable that he was intoxicated by reason of introduction of a controlled substance or some combination of substances. *See* TEX. R. EVID. 401; *cf. Layton*, 280 S.W.3d at 241–42.

Appellant similarly relies on *DeLarue v. State*, 102 S.W.3d 388 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd), for the proposition that a failure to extrapolate a controlled substance to the time of an event at issue can render evidence showing mere presence of a substance inadmissible. *Id.* at 401. In *DeLarue*, our sister court concluded that the admission of evidence of marijuana in the defendant's bloodstream to show intoxication without a *Daubert-Kelly* hearing was error, because without proof of scientific reliability, the evidence was more prejudicial than probative. *Id.* at 401–02 ("Because there was no *Daubert-Kelly* hearing held to determine the reliability of the State's marijuana evidence as it related to appellant's intoxication and resultant behavior, we find the trial court erred in admitting this evidence."). The court observed that though the State elicited testimony showing the presence of marijuana in the defendant's bloodstream:

> [N]o attempt was made to *quantify* the presence; no attempt was made to show *when* the marijuana was introduced into his system; no attempt was made to show appellant was "under the influence" of the marijuana at the time of the accident; and no attempt was made to show causation between appellant's behavior and the presence of marijuana in his system.

*Id.* at 401.

Appellant's reliance on *DeLarue* is problematic for multiple reasons. First and foremost, here, the trial court did what the trial court in *DeLarue* failed to do: the trial court held a *Daubert-Kelly* hearing to determine the reliability of the State's TFMPP evidence. Though no attempt was made to quantify the presence of TFMPP in Ashby's blood sample and no attempt was made to show when the TFMPP was introduced into his system, the State did attempt to show Ashby was under the influence of TFMPP at the time of the traffic stop. *Cf. id.* at 401. Dr. Walterscheid opined that the presence of parent cocaine in Ashby's sample suggested recency of use. He testified to the effects of TFMPP, which include the known aftereffect of drowsiness. Coupled with video evidence of the arrest and testimony of the arresting officer, the State attempted to establish a logical connection between Ashby's condition at the time of his arrest and the presence of an unquantified amount of TFMPP in his blood sample. Thus, the trial court reasonably could have found the presence of TFMPP in Ashby's blood sample probative. *Cf. id.* at 401–02.

Secondly, *DeLarue* does not categorically require the quantification of a controlled substance in a defendant's bloodstream in order to prove intoxication. The *DeLarue* court did note that evidence can be rendered inadmissible by a "failure to extrapolate the presence of a controlled substance back to the time of an accident—because such failure can render the evidence insufficient under a Rule 403 analysis." *Id.* at 401 (citing *Manning v. State*, 84 S.W.3d 15, 22 (Tex. App.—Texarkana 2002), *rev'd*, 114 S.W.3d 922 (Tex. Crim. App. 2003)). However, the case supporting that proposition—*Manning*, 84 S.W.3d at 22—was subsequently reversed by the Court of Criminal Appeals, which cautioned against confusing sufficiency with admissibility. *See Manning*, 114 S.W.3d at

927 ("The fact that this evidence may not have been sufficient, by itself, to prove that Manning's actions were the result of his ingestion of cocaine does not detract from the fact that the evidence of the metabolite was strong evidence that Manning had consumed cocaine."). Here, though evidence that an unquantified amount of TFMPP was in Ashby's bloodstream at the relevant time may not have been sufficient, by itself, to prove that the observed loss of the normal use of his mental and physical faculties resulted from ingesting TFMPP, it is nevertheless some evidence that Ashby consumed TFMPP. The failure to quantify TFMPP in Ashby's bloodstream lessens the inherent probative force of the evidence, but it does not render it unreliable or irrelevant under Rule 702.

Ashby further complains that Dr. Walterscheid was not qualified to opine on the effects of TFMPP because there had been limited human testing, he had no knowledge of its absorption and elimination rates, and he could not extrapolate time of ingestion. Each of these complaints arises not because Dr. Walterscheid is not qualified to offer an opinion concerning the presence or absence of TFMPP, but because there is a dearth of scientific knowledge concerning the pharmacokinetics of TFMPP. Both parties' experts agreed that no human studies had been conducted on TFMPP, and as a result, that the absorption and elimination rates for TFMPP are unknown. Thus, while both experts were able to testify as to the general effects of TFMPP, neither could have testified as to the specific pharmacokinetics of TFMPP. Expert scientific testimony is necessarily limited by the reach of science, and Dr. Walterscheid appropriately did not purport to offer an expert opinion that exceeded scientific knowledge.

Finally, Ashby relies on *State v. Guzman*, 439 S.W.3d 482 (Tex. App.—San Antonio 2014, no pet.), to argue that Rule 702 requires the analyst who tests the blood sample to be capable of offering testimony concerning the effects of the drug. *See id.* at 488. In *Guzman*, the San Antonio Court of Appeals wrote: "our case law is clear that with respect to blood tests, the expert who must satisfy the criteria in any particular case is the analyst who tests the blood sample, not the nurse who performs the blood draw." *Id.* at 488–89 (first citing *Mata v. State*, 46 S.W.3d 902, 914–15 (Tex. Crim. App. 2001); then citing *Adkins v. State*, 418 S.W.3d 856, 862 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); and *Subirias v. State*, 278 S.W.3d 406, 410–11 (Tex. App.—San Antonio 2008, pet. ref'd)). Unlike in *Guzman*, here, no testimony concerning the relevance and reliability of scientific testing of the blood sample was solicited from the phlebotomist, who performed the blood draw. Thus, *Guzman* is of limited value. Rather than relying on testimony from the phlebotomist, in this case, the State relied on the testimony of two scientists at the Harris County Institute of Forensic Scientists. Dr. Chen testified about the process of analyzing Ashby's blood, and Dr. Walterscheid explained the significance of that analysis and its result. Neither *Guzman* nor the cases relied upon by *Guzman* foreclose the use of two scientific experts involved in the analysis of a blood sample from testifying concerning their respective parts of the analysis.

For the foregoing reasons, we conclude that the trial court did not err in allowing the State to introduce evidence of TFMPP in Ashby's blood, and we overrule Ashby's second issue.

### Conclusion

We affirm the trial court's judgment.

Jennings, J., dissenting.

Terry Jennings, Justice, dissenting.

Because the majority errs in holding that the evidence that appellant, David Rowe Ashby, had Trifluoromethylphenyl-piperazine ("TFMPP") in a sample of his blood taken after his arrest for the misdemeanor offense of driving while intoxicated [1] was relevant and reliable, I respectfully dissent. *See* Tex. R. Evid. 401, 402, 403, 702.

In his second issue, appellant argues that the trial court erred in overruling his objection to the State's evidence that he had TFMPP in his blood sample because the State did not establish that the evidence was relevant and reliable, rendering it inadmissible under rules 402, 403, and 702. *See Layton v. State*, 280 S.W.3d 235, 240–42 (Tex. Crim. App. 2009); *see also* Tex. R. Evid. 401 (evidence relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action").

The proponent of scientific evidence bears the burden of establishing, by clear and convincing evidence, that the evidence is sufficiently relevant and reliable to assist the jury in determining a fact in issue. *Layton*, 280 S.W.3d at 241.

Here, as noted by the majority, the State's own expert, Dr. Walterscheid, Co-Director of Toxicology at the Harris County Institute of Forensic Science, explained that even if the TFMPP in appellant's blood had been quantified, which it was not, he would not have been able to reliably extrapolate whether TFMPP was psychoactive at the time of appellant's arrest, given the lack of scientific knowledge regarding the effects of TFMPP. Without expert testimony to provide the foundation required to admit scientific testimony, the evidence that appellant had TFMPP in his

blood sample after his arrest was not relevant. *See id.* at 242. Thus, the trial court erred in overruling appellant's objection to the State's evidence that he had TFMPP in the sample of his blood taken after his arrest.

Accordingly, I would sustain appellant's second issue, reverse the judgment of the trial court, and remand the case to the trial court for further proceedings.

---

1.   *See* Tex. Penal Code Ann. § 49.04(a)–(b) (Vernon Supp. 2016).