**Opinion issued November 13, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-17-00598-CR** *and*

**NO. 01-17-00599-CR**

———————————

**TIKA ANDERSON ENGLISH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1477504 and 1477505**

---

## MEMORANDUM OPINION

After colliding head-on with another vehicle and seriously injuring its occupants, Tika Anderson English was indicted on two charges of intoxication assault. *See* TEX. PENAL CODE § 49.07. A jury found English guilty as charged.

After finding true the enhancement paragraphs alleging that English had two prior felony convictions, the trial court sentenced her to 45 years' confinement on each count, with the sentences to run concurrently.

On appeal, English contends that the trial court erred in denying her motion to suppress her blood-test results, and that insufficient evidence supports the jury's finding that she was intoxicated when the collision occurred. We hold that the trial court did not abuse its discretion in denying the motion to suppress and sufficient evidence supports the intoxication finding; we therefore affirm.

## BACKGROUND

### The accident

During the rush hour one afternoon in April 2015, a major car accident occurred on Veteran's Memorial Drive in Northwest Harris County. Veteran's Memorial is a two-way, four-lane road. It has a double yellow line between the northbound and southbound lanes, but no median. Gillian Taylor was driving her Jeep SUV in the inside northbound lane, toward the West Road intersection. The traffic was heavy. Taylor and her friend, Mieshia Veal, were on their way to pick up their children from day care. Veal was not feeling well; she had reclined the front passenger seat and fallen asleep.

As Taylor neared the West Road intersection, she saw a Mercedes sedan, moving erratically as it approached from the southbound side of the intersection.

2

Taylor watched as the driver swerved and moved across the double yellow line and into Taylor's lane. The driver moved back into the original southbound lane, but then picked up speed and again swerved into Taylor's lane.

Clarescia Luckey was heading northbound on Veteran's Memorial in front of Taylor's SUV. She, too, noticed the Mercedes sedan weaving in and out of traffic. Suspecting that the driver might be on drugs, Luckey watched as the driver of the sedan crossed the double-yellow line, swerved nearly halfway into the oncoming traffic, returned to the southbound lane, and then suddenly swerved back into the northbound lane, gaining speed as it approached going the wrong way. Luckey maneuvered to the right to avoid a collision and landed in a ditch past the road's shoulder. The sedan collided head-on with Taylor's SUV. Two other vehicles also were involved in the crash.

Luckey emerged from her car unharmed. As Luckey climbed out of the ditch, she heard strange screams coming from the Mercedes sedan. She walked toward the sedan, believing that the person inside was injured. By the time Luckey reached the car, the driver, English, had opened the driver's-side door and stepped outside. All of the sudden, English stopped screaming. Then, a short time later, she began screaming again. English continued screaming at intervals until she went back inside her car.

3

Luckey thought English looked "fidgety," and she found English's behavior very strange. She heard English complain out loud about the damage to her car and noticed that English did not seem concerned about whether anyone else involved in the accident was injured. English's behavior confirmed Luckey's initial impression that the sedan's driver was high on drugs.

Concluding that English did not need her help, Luckey headed toward the other vehicles involved in the accident. Taylor's SUV took the brunt of the impact; the force of the crash compressed the floor and the undercarriage and pushed them into the front compartment, particularly on the passenger side. Veal's legs were crushed and ultimately had to be amputated; her pelvis and right hip were broken; and her liver, bladder, and intestines were lacerated. Taylor suffered back injuries and required stitches for a head contusion. She also has experienced hearing loss since the collision.

Officers from the Harris County Sheriff's Office and emergency medical support arrived at the scene. At 6:12 p.m., a member of an ambulance crew gave English 100 micrograms of fentanyl to treat her pain, then transported her to Northwest Medical Center. The ambulance records describe English as being oriented, having appropriate speech, and giving appropriate motor responses to commands. The ambulance arrived at the hospital at about 6:30, and English was admitted a few minutes later.

**Evidence pertaining to English's motion to suppress**

Hospital records report that E. Martinez, an emergency-room nurse, had completed English's physical examination by 6:39 p.m. Martinez's notes indicate that English appeared alert and "oriented to person, place, time, and situation."

Deputy R. Wagner, who led the accident investigation, sent Deputy D. Wilkie to meet with English at the hospital and report to him on her condition. Wilkie found English in a treatment room at 7:20 p.m. When Wilkie arrived, two hospital staff were attending to English: Martinez and K. Smith, a paramedic.

English was awake and moaning in apparent pain. Hospital records show that Martinez gave English one milligram of hydromorphone, an opioid pain reliever, at 7:20 p.m., approximately the same time that Wilkie entered the room.

English knew her name and gave coherent responses to Wilkie's questions about the crash. She had not lost consciousness as a result of the accident. Wilkie noted that her speech and coordination seemed normal, and she did not appear to have acute distress, anxiety, or any neurological deficit. English informed Wilkie that she had taken medication prescribed to treat her anxiety and bipolar disorder, but denied having had anything alcoholic to drink that day.

When English finished answering Wilkie's questions, Wilkie stepped out of the room and called Wagner. After Wilkie reported on English's condition, Wagner asked Wilkie to find out whether English would be willing to provide a blood

sample. Wilkie completed the call and returned to English's room. He asked English if she would voluntarily provide a blood sample; she replied that she would. According to Wilkie, English's consent appeared to be intelligent, knowing, and voluntary.

While Wilkie spoke with English, Martinez was preparing her for a medical procedure on her dislocated right ankle. Martinez had English sign a consent form for the anesthesia and the medical procedure at 7:30 p.m. At 7:42, Martinez administered 1 milligram of propofol to sedate English for the procedure. Martinez explained that it usually takes about five minutes for a patient to come under the influence of a medication like hydromorphone, but if the patient has other medication in her system, such as a stimulant, it may take longer. She observed that "it depends" on a person's reaction whether they are coherent after receiving sedation.

Neither Smith nor Martinez recalled treating English, but they testified as to how they would respond if a police officer asked for a patient's blood sample. In the 14 years that Smith has worked as a paramedic, he has never seen a medical or police procedure performed without the patient's consent. If he had ever encountered that situation, though, he would have told the attending nurse about the lack of consent and reported the incident to the charge nurse.

As an emergency-room nurse, Martinez has performed law-enforcement blood draws on many occasions. Martinez testified that she would draw blood only with the patient's consent or pursuant to a warrant. She explained that she had to "hear it from the patients themselves" before she would perform a blood draw without a warrant; assurances of consent from law enforcement were not enough. Martinez further stated that said she would not verify a patient's consent after she had given medication to a patient.

Before the blood draw, Wilkie recounted, Martinez consulted with the charge nurse about the hospital's procedures for performing a blood draw when the patient is under sedation. When Martinez returned, Wilkie gave her two gray-topped vials containing anticoagulant powder. English was unconscious from the sedation at approximately 8:00 p.m. when Martinez started the blood draw. When Martinez completed the draw, Wilkie asked her which medications English had received at the hospital. Martinez responded that English had received 1 milligram of hydromorphone and 100 milligrams of propofol.

Wilkie labeled the vials containing English's blood, marked them "1st" and "2nd," and rotated them to thoroughly mix the anticoagulant with the blood. Because Wilkie was ending his shift, he gave the vials to Deputy Dunn, who was beginning his shift. Dunn marked the vials with the offense number, placed them in

a manila envelope and delivered them to the Harris County Medical Examiner's Office for safekeeping.

English moved to suppress the evidence relating to the blood draw. The trial court held a suppression hearing during the trial, outside the presence of the jury. After hearing testimony from Wilkie, Martinez, and Smith, and the parties' arguments, the trial court denied the motion.

**Analysis of English's blood specimen**

Two toxicologists employed by the Harris County Institute of Forensic Sciences (IFS) testified about the blood samples retrieved from English. The first, Linda Nickell, explained that the testing method used on blood samples identified the presence of drugs within a certain range, with the threshold amount being the lowest detectible amount and the "ceiling limit of quantitation" being the highest amount that the testing can measure. The report on English's blood specimen indicated that no fentanyl was detected and the specimen was not tested for the presence of hydromorphone or propofol. Nickell testified that English's blood specimen tested positive for two controlled substances: amphetamine and methamphetamine.

The amphetamine, a metabolite of methamphetamine, was at a concentration of 0.19 plus or minus 0.03 milligrams per liter. The methamphetamine detected was

8

at a concentration "greater than 1.0 milligram per liter." In other words, the concentration of methamphetamine "exceeded the limit of quantitation."

Nickell testified that she has completed thousands of blood-specimen analyses during her employment with IFS. She observed that it was uncommon to encounter a sample containing a concentration of methamphetamine as high as that detected in English's blood and that when she did, the sample usually came from a person who had died.

Like Nickell, Theresa Gray, the chief toxicologist at IFS, opined that the concentration of methamphetamine found in English's blood was high relative to what IFS typically found in specimens collected in driving cases and at autopsies. Gray explained that that methamphetamine is a central nervous system stimulant which, in very low concentration dosages of 60 milligrams or less, could be used to treat narcolepsy and ADHD. Gray distinguished those uses from recreational use, which she defined as the use of methamphetamine in amounts greater than 100 milligrams.

Gray described the physiological and behavioral effects of recreational methamphetamine use. She explained that the ingestion of a recreational amount of methamphetamine causes the user to experience a "rush phase" lasting for about 15 minutes to an hour. In the rush phase, the user experiences an increase in heart rate and muscle movement, as well as rapid thoughts, extreme euphoria, and high self-

9

confidence. These reactions frequently manifest in risk-taking behavior. As the metabolic process breaks down the methamphetamine, she continued, the user enters the "crash phase." During the crash phase, Gray explained, feelings of paranoia, irritability, fatigue, and depression set in, which typically trigger the user to engage in drug-seeking behavior. As the methamphetamine metabolizes into amphetamine during the crash phase, the user also may experience another rush-crash cycle caused by the amphetamine working in concert with the methamphetamine remaining in the user's system.

Gray drew on literature describing the driving behavior of people who had methamphetamine in their systems when they were arrested. She explained that those drivers were found to have engaged in weaving, speeding, and other risky behaviors. Recreational users of methamphetamine, she observed, frequently will move rapidly, have trouble staying still, and have difficulty focusing and following instructions. A recreational dose of methamphetamine would impair the user's ability to drive in both the rush phase and the crash phase.

Gray also addressed the possible interactions between methamphetamine and the medications that English had taken the day of the accident. She noted that English's anti-anxiety medication, when combined with methamphetamine, would have blunted her depression experience during the crash phase. Gray further opined

that hydromorphone or propofol could have altered some of the symptoms that usually appear during methamphetamine use.

## DISCUSSION

English challenges the trial court's denial of her motion to suppress and the sufficiency of the evidence that she was intoxicated when the accident occurred.

## I.     Denial of Motion to Suppress

English contends that the trial court erred in denying her motion to suppress evidence relating to the blood samples—the State's only evidence of her intoxication—because she did not give valid consent to the blood draw.

### A.     Standard of review and applicable law

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *See Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016); *Rodriguez v. State*, 469 S.W.3d 626, 630 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). We apply a bifurcated standard to make this determination. *Brodnex*, 485 S.W.3d at 436; *Rodriguez*, 469 S.W.3d at 630. In reviewing the evidence, we recognize the trial court as the sole trier of fact and judge of the weight and credibility of the evidence, and thus defer to its findings of historical fact as well as any necessary implied findings if the record supports them. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013); *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *see Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App.

2007). We review de novo the trial court's application of law to those facts. *See Crain*, 315 S.W.3d at 48. We will sustain the trial court's ruling if it is reasonably supported by the record and correct under any applicable theory of law. *Brodnex*, 485 S.W.3d at 436–37.

A search attendant to a criminal investigation requires a search warrant or comes within a recognized exception to the warrant requirement, and, in either case, must be reasonable under the totality of the circumstances. *State v. Villarreal*, 475 S.W.3d 784, 796 (Tex. Crim. App. 2014); *see also Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 574 (1967) (explaining that warrantless search is per se unreasonable unless it falls within a recognized exception to warrant requirement). Voluntary consent to search is among the recognized exceptions to the warrant requirement. *See Villarreal*, 475 S.W.3d at 799–808 (discussing consent, automobile, search incident to arrest, and special-needs exceptions); *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003). A driver's consent to a blood test must be free and voluntary, and it must not be the result of physical or psychological pressures brought to bear by law enforcement. *Fienen v State*, 390 S.W.3d 328, 333 (Tex. Crim. App. 2012) (citing *Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011)); *see Hutchins v. State*, 475 S.W.3d 496, 498 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

"[T]o be valid for Fourth Amendment purposes, consent must be freely and voluntarily given based on the totality of the circumstances and must not have been revoked or withdrawn at the time of the search." *Villarreal*, 475 S.W.3d at 800 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047–48 (1973), and *Florida v. Jimeno*, 500 U.S. 248, 252, 111 S. Ct. 1801, 1804 (1991)).

A person who is intoxicated may be capable of voluntary consent. Whether intoxication rendered the defendant incapable of making an independent, informed decision is a fact question. *See Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996); *Paolilla v. State*, 342 S.W.3d 783, 792 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Under Texas law, the State bears the burden to prove the voluntariness of an alleged consent by clear and convincing evidence. *State v. Ibarra*, 953 S.W.2d 242, 245 (Tex. 1997); *Hutchins*, 475 S.W.3d at 498; *see* TEX. CONST. art. I, § 9. "Because issues of consent are necessarily fact intensive, a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous." *Meekins*, 340 S.W.3d at 460; *Hutchins*, 475 S.W.3d at 498; *see Donjuan v. State*, 461 S.W.3d 611, 617 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

**B.     Analysis**

English recognizes that much of the evidence as to her ability to have consented to the blood draw is disputed. In contending that the trial court erred in denying her motion, however, English points to five pieces of evidence that, she

13

contends, are undisputed, namely that (1) she was given fentanyl by an ambulance crew member at 6:12 p.m.; (2) Wilkie entered her hospital room at 7:20 p.m.; (3) she was given hydromorphone at 7:20 p.m. and propofol at 7:42 p.m.; (4) Wilkie testified that English consented to the draw after she had been given those medications; and (5) Martinez testified that she had given hydromorphone to patients in the past and they cannot consent after it is administered.

The evidence shows that English received 100 micrograms of fentanyl in the ambulance, but no evidence shows whether that dose would have affected English more than an hour after receiving it, when she spoke with Wilkie. As to the evidence concerning whether English received both the hydromorphone and the propofol or just the hydromorphone before giving consent, we note that her position here differs from the one she took in the trial court: in arguing her motion, English admitted that "there's a question as to whether the propofol had already been given" before she consented to the blood draw.

The record contains disputed evidence concerning the order of events and thus supports the position that English took in the trial court. When Wilkie arrived at English's room, he described English as having normal speech, no acute distress, and no apparent anxiety. Wilkie testified that he did not ask for the names the medications that English received until after Martinez had completed the blood draw. Wilkie also testified that he did not know the time he arrived or how long he

14

had been at the hospital before Wagner told him to ask for a blood sample. This testimony undermines any inference that English had been given both hydromorphone and propofol before she gave consent. And, given the brevity of Wilkie's conversations with English and Wagner, the trial court reasonably could have inferred that Wilkie asked for and received English's consent within the 22 minutes between Wilkie's initial arrival and the time English received the propofol.

Similarly, Martinez's statement that a patient who has received hydromorphone cannot give valid consent is tempered by her later testimony. Martinez explained that it may take five minutes or more for a patient to come under the influence of a medicine like hydromorphone and that whether a person is coherent after receiving sedation depends on the person's reaction to the sedative. According to her practice, Martinez recounted, she verifies a patient's consent for a law-enforcement blood draw before proceeding, and she would not seek consent from a patient under the influence of hydromorphone.

Martinez proceeded with English's blood draw and, in the hospital record, Martinez noted that English was coherent, alert, and appropriately oriented as late as 7:39 p.m. This evidence conflicts with any inference that English was incapable of giving valid consent.

English relies on *Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408 (1978), to support her position that her consent was invalid, but the facts of that case render it

inapposite. The Supreme Court held that Mincey's consent to search was not "the product of his free and rational choice" where he consented while he was under arrest, barely conscious, in great pain, and alone in the hospital emergency room with the police detective, who subjected him to continuous questioning. *Id.* at 401, 98 S. Ct. at 2418. Further, Mincey had asked the officer to stop numerous times throughout the interrogation, but the officer continued to question him. *Id.* at 399–400, 98 S. Ct. at 2417–18.

In contrast here, English was not under arrest. Although she was in pain, she did not seem to be in acute distress. She appeared alert and oriented, and her responses to questions were coherent. A paramedic and nurse were attending to English when Wilkie asked English for her consent to the blood draw. Both hospital personnel testified that they would not have cooperated with the blood draw and would have reported the situation to the charge nurse had it appeared that Wilkie coerced English, if English seemed reluctant to cooperate, or if English was under the influence of medication that would have rendered her unable to consent. This record lacks the elements supporting the finding of coercion in *Mincey*.

English's situation is more like that in *Gelabert v. State*, 712 S.W.2d 813 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd). The defendant in that case complained that her consent to a search was invalid because it was secured when she was in the hospital and under medication. *Id.* at 816. This Court observed that, in addition to

16

the defendant's own testimony, the record contained testimony from the investigator that the defendant was alert and knew what she was doing when she signed the consent. *Id.* This Court held that the trial court acted within its discretion in rejecting the defendant's testimony and overruling her motion to suppress. *Id.*

Considering the disputes in the record and deferring to the evidence supporting the trial court's findings, the totality of the circumstances reasonably supports the trial court's findings that English was alert and coherent while she spoke with Wilkie and that English's consent to the blood draw was voluntarily given. We therefore hold that the trial court acted within its discretion in denying her motion to suppress.

## II. Sufficiency of the Intoxication Evidence

English next contends that the evidence is insufficient to support a finding that when the collision occurred, she was intoxicated by an amount of methamphetamine sufficient to cause her to lose her mental or physical faculties.

### A. Standard of review and applicable law

We apply a legal-sufficiency standard of review in determining whether the evidence supports each challenged element of a criminal offense. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Under this standard, we view the evidence in the light most favorable to the verdict and determine whether a rational

17

factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (relying on *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2788–89). We defer to the jury's resolution of conflicts in the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

The Penal Code defines "intoxicated" as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body." TEX. PENAL CODE § 49.01(2)(A). The State may prove intoxication through circumstantial evidence and without proof of the type of intoxicant. *See Gray v. State*, 152 S.W.3d 125, 132 (Tex. Crim. App. 2004); *Paschall v. State*, 285 S.W.3d 166, 177 (Tex. App.—Fort Worth 2009, pet. ref'd). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

## B.    Analysis

English contends that the evidence showing the presence of methamphetamine in her blood is insufficient to prove that she was intoxicated because the lab calculations measured the concentration of methamphetamine in her

blood, while the expert testimony adduced by the State concerned the effect of certain dosages of methamphetamine.

This argument is unavailing. The statute does not require the State to prove that the defendant ingested a specific amount of the controlled substance. *See Ashby v. State*, 527 S.W.3d 356, 364 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (holding that expert testimony was admissible even without attempt to quantify amount of controlled substance in defendant's bloodstream or when it was ingested, given proof that substance was present in blood sample, coupled with video evidence of arrest and testimony of arresting officer, that supported finding of logical connection between defendant's condition and presence of unquantified amount of substance in blood sample).

Despite the different measures, both Nickell and Gray testified that English's blood sample showed an unusually high concentration of methamphetamine—a level they were more likely to find in a blood sample collected during an autopsy. Gray also described the typical driving impairments and other behavior found in a recreational methamphetamine user, descriptions that correspond to Luckey's and Taylor's testimony concerning English's erratic driving immediately before the crash, as well as Luckey's description of English's behavior following the accident. *See Gray*, 152 S.W.3d at 132; *Ashby*, 527 S.W.3d at 364. We hold that sufficient evidence supports the jury's finding that English did not have the normal use of her

mental or physical faculties when the accident occurred by reason of the introduction of methamphetamine into her body.

## CONCLUSION

We affirm the judgments of the trial court.


Jane Bland
Justice

Panel consists of Justices Keyes, Bland, and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).