**Motion for En Banc Reconsideration Granted; En Banc Majority and Dissenting Opinions of December 16, 2021 Withdrawn; Affirmed in Part, Reversed and Remanded in Part, and Substitute En Banc Majority and Dissenting Opinions filed February 24, 2022.**



**In The**

# Fourteenth Court of Appeals

### NO. 14-19-00839-CR

### ALAN WILLIAM NULL, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 209th District Court
Harris County, Texas
Trial Court Cause No. 1443617**

## SUBSTITUTE EN BANC MAJORITY OPINION

A jury found Appellant Alan William Null guilty of sexual assault of a child. After finding true an enhancement for a previous conviction of burglary of a habitation, the jury assessed punishment at imprisonment for 60 years. *See* Tex. Penal Code Ann. § 22.011(a)(2). On appeal, Appellant raises eleven issues

addressing both the guilt/innocence and punishment phases of trial. For the reasons below, we (1) conclude the panel's decision created discord in this Court's decisions concerning expert testimony, (2) conclude the panel's decision concerning judicial notice creates the extraordinary circumstance of violating clearly established due process protections contrary to jurisprudence from the United States Supreme Court, (3) affirm the portion of the trial court's judgment concerning Appellant's conviction, and (4) reverse the portion of the trial court's judgment concerning Appellant's punishment and remand the case to the trial court for a new punishment hearing.

## BACKGROUND

Complainant, a sixteen-year-old girl, came home in a confused state early one morning and told her mother that she had just been raped. The mother took Complainant to the hospital, where Complainant was examined by a sexual assault nurse examiner.

Complainant told the nurse that she went out for a jog and was then stopped by a man in a car who had offered her a ride home. Complainant said that she got in the car because the man had sweet-talked her but, rather than take her home, the man drove her to a park, where he used a switchblade to forcibly have sex with her.

After leaving the hospital, Complainant revealed that the jogging story was false. She said that what really happened was that she had skipped school because she was upset over a break up, and she stayed home to drink alcohol while her mother was away at work. She later contacted an adult female friend to join her, and the friend came over to Complainant's house, where they drank more alcohol together.

Before Complainant's mother returned home from work, the friend drove Complainant to her own house, which was less than two miles away. Complainant became intoxicated there and passed out. When she woke up, the hour was late and the friend was asleep. Because Complainant was frantic to get home, she decided to walk home by herself.

Complainant stated that she blacked out on her walk home and that she woke up in an unfamiliar car with someone "pressing" on top of her. She did not get a good look at the other person and said she did not remember much about the incident at all.

A toxicology report showed that Complainant had Xanax and marijuana in her system. Additional forensic analysis found semen in her vagina and underwear.

A few years after the semen sample was collected, Appellant was identified as a possible suspect in the sexual assault. Appellant, who was nearly thirty-eight years old at the time of the sexual assault, consented to providing a buccal swab and, based on a test of that buccal swab, a DNA analyst determined that Appellant could not be excluded as a contributor of the semen sample that had been collected from Complainant.

Appellant was charged with Complainant's sexual assault. He pleaded not guilty to that charge and his case proceeded to a trial by jury. During the trial, Complainant testified that she did not know anyone by Appellant's name and that she never socialized with men in Appellant's age group. She reiterated that she could not remember much about the night in question and she did not identify Appellant in open court as her attacker.

Appellant did not testify in his own defense. After the State rested its case, the jury convicted Appellant as charged. Appellant proceeded to a punishment hearing, in which the jury heard testimony from ten witnesses. After the close of evidence, the jury assessed punishment at 60 years' confinement. Appellant timely appealed and a divided panel of this court affirmed. A majority of the Court voted to grant en banc reconsideration to maintain the uniformity of our jurisprudence concerning Texas Rule of Evidence 702. *See* Tex. R. App. P. 41.2(c).

ANALYSIS

Appellant raises eleven issues on appeal challenging (1) the dismissal of jurors during voir dire, (2) evidence admitted during the guilt/innocence phase of trial, (3) the jury charge, (4) the sufficiency of the evidence underlying his conviction, and (5) evidence admitted during the punishment hearing. We take Appellant's issues out of order and begin with his sufficiency challenges (issues four, five, and six) because, if meritorious, they would afford greater relief than the other issues he raises on appeal. *See Roberson v. State*, 810 S.W.2d 224, 225 (Tex. Crim. App. 1991) (en banc) (per curiam) (indicating that rendition points should be addressed before remand points).

## I.     Sufficiency of the Evidence

In a sufficiency challenge, a reviewing court must determine whether a rational trier of fact could have found the essential elements of an offense beyond a reasonable doubt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). When deciding whether the prosecution satisfied this burden, we consider all of the evidence in the light most favorable to the verdict. *See Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018).

### A.     Sexual Assault of a Child

In his fourth issue, Appellant contends "[t]here was insufficient evidence to convict as the State failed to prove that there was penetration."

The offense here was sexual assault of a child, which meant that the prosecution had the burden of proving the following essential elements: (1) Appellant intentionally or knowingly caused the penetration of the Complainant's sexual organ, and (2) Complainant was younger than seventeen years of age at the time of the penetration. *See* Tex. Penal Code Ann. § 22.011(a)(2)(A), (c)(1).

The jury reasonably could have found that Appellant intentionally or knowingly penetrated Complainant's sexual organ because there was evidence that his semen was collected from Complainant's vaginal swab. The jury could have likewise determined that Complainant was younger than seventeen years of age at the time of the offense because her mother testified that Complainant was sixteen when the incident happened.

Appellant counters that the evidence of penetration is insufficient because the in-court testimony from Complainant "is completely devoid of any sexual act." Appellant correctly observes that Complainant testified during the trial that she did not remember much about the incident. Indeed, she did not provide many details at all about the sexual assault. However, just after the assault occurred, Complainant told her mother that she had been raped, and the mother repeated that statement in front of the jury. Also, Complainant told the sexual assault nurse examiner that the man who attacked her had "put his penis in her vagina." That statement was recorded in the nurse's notes, which were admitted for the jury's consideration. Together, these statements provided the jury with a substantial basis for finding that penetration occurred. *See, e.g., Adams v. State*, 502 S.W.3d 238,

244 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (nurse's testimony that the complainant told her she had performed oral sex on the appellant was sufficient to support the appellant's conviction even though the complainant testified she "could not remember everything that occurred that night and . . . could not remember performing oral sex on appellant").

Based on the foregoing, we conclude that there was legally sufficient evidence from which the jury could have found every essential element of the offense beyond a reasonable doubt.

We overrule Appellant's fourth issue.

## B.     Venue

In his fifth issue, Appellant argues that "[t]here was insufficient evidence to convict as the State failed to prove that the offense occurred in Harris County, Texas."

The evidence at trial showed that Complainant lived in the city of Jersey Village, which is located within Harris County, and that her adult female friend lived less than two miles to the east in the City of Houston. The evidence did not establish where the sexual assault occurred and, absent such evidence, Appellant contends that the prosecution failed to prove that venue was proper in Harris County.

Venue is not an element of the offense, which means that the prosecution is not required to prove it beyond a reasonable doubt. *See Schmutz v. State*, 440 S.W.3d 29, 34 (Tex. Crim. App. 2014). The prosecution must only establish that venue is proper by a preponderance of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 13.17. We presume that the prosecution satisfied that burden unless venue was disputed in the trial court or the record affirmatively shows that venue

6

was improper.  *See* Tex. R. App. P. 44.2(c)(1).

Here, Appellant did not dispute venue during the trial, and he concedes on appeal that he did not produce any evidence affirmatively showing that venue would have been proper in a different county.  Therefore, we presume on this record that the prosecution satisfied its burden of showing by a preponderance of the evidence that the proper venue was in Harris County.  *See, e.g., Williams v. State*, 356 S.W.3d 508, 518-19 (Tex. App.—Texarkana 2011, pet. ref'd) (overruling the appellant's venue challenge on appeal when the appellant "did not challenge venue in the trial court and the record does not affirmatively show that venue [did] not exist").

We overrule Appellant's fifth issue.

## C.    Spouse

In his sixth issue, Appellant contends the State failed to prove that Complainant was not his spouse.

The prosecution alleged in both the indictment and the jury charge that Appellant was not Complainant's spouse.  Appellant correctly observes that his marital relationship was not an element of the offense.  Marital relationship relates instead to an affirmative defense.  *See* Tex. Penal Code Ann. § 22.011(e)(1).  Appellant did not claim that defense in this case, but he argues that the prosecution had the burden to prove what it had pleaded — *i.e.*, that Appellant was not Complainant's spouse.  As to that point, Appellant argues that the evidence is legally insufficient.

This argument fails for two reasons.  First, in a sufficiency challenge, we assess the evidence against the elements of the offense as defined in the hypothetically correct jury charge — not against an erroneously heightened

command in the charge. *See Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. Crim. App. 2018); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc). Thus, the prosecution was not required to prove that Appellant was not Complainant's spouse.

And second, even if we assumed for the sake of argument that the prosecution had the burden of proving that Appellant was not Complainant's spouse, there was testimony directly from Complainant that she did not know anyone by Appellant's name and that she did not associate with men in his age group. The jury could have reasonably inferred from that testimony that she did not know Appellant and that they were not married to each other.

We overrule Appellant's sixth issue.

## II.    Dismissal of Jurors During Voir Dire

The voir dire in this case spanned two days and required two separate venire panels. After the first day, a partial jury of eleven jurors was seated. Soon after being seated, one of these eleven jurors approached the bench and informed the trial court that she was not fluent in English. When the trial court inquired how much English she understood, she responded as follows: "Well, some words, I can understand. I tell them to tell you I can't speak English that good because I don't know if it would be fair to sometimes — some words I can understand, some words not." The trial court excused this juror *sua sponte*, over Appellant's objection that the juror could actually understand English.

On the second day of voir dire, another juror from the original eleven came forward to also say that he was not fluent in English. He told the trial court, "Yeah, well my problem is I don't consider to speak much English. I don't understand everything they say and the thing is I don't get everything what they

say and I don't know if I could." The trial court excused this juror *sua sponte* as well, over Appellant's objection that the juror was qualified.

In his first and second issues, Appellant contends that the trial court abused its discretion by removing both of these jurors without a corresponding motion from the prosecution.

Appellant correctly observes that "a trial court should not on its own motion excuse a prospective juror for cause unless the juror is absolutely disqualified from serving on a jury." *See Johnson v. State*, No. AP-77,030, 2015 WL 7354609, at *12 (Tex. Crim. App. Nov. 18, 2015) (not designated for publication) (citing *Martinez v. State*, 621 S.W.2d 797, 798 (Tex. Crim. App. 1981) (en banc)); *see also* Tex. Code Crim. Proc. Ann. art. 35.19 (providing that a person is absolutely disqualified from serving on a jury if he has been convicted of misdemeanor theft or a felony, if he is presently charged with misdemeanor theft or a felony, or if he is insane). However, Appellant did not preserve error on this basis. Instead, Appellant argued that both jurors should remain on the jury because they understood English. On neither occasion did he object that the trial court was improperly excusing the juror on its own motion.

Even if we assumed for the sake of argument that error had been preserved, Appellant cannot show that he was harmed. The trial court determined that both jurors were excludable for cause because they did not fully understand English. *See* Tex. Code Crim. Proc. Ann. art. 35.16(a)(11) (providing that a juror may be challenged for cause if "the juror cannot read or write"); *Montoya v. State*, 810 S.W.2d 160, 170 (Tex. Crim. App. 1989) (en banc) (applying Article 35.16(a)(11) to a prospective juror who expressed difficulty understanding spoken English). When a trial court excludes a disqualified juror for cause on its own motion, the error in acting *sua sponte* is considered harmless unless the defendant shows that

9

he was tried by a jury to which he had a legitimate objection. *See Montoya*, 810 S.W.2d at 170. Here, Appellant has not identified any objections to the final jury that was seated in this case. Therefore, we conclude that any error in the removal of the two jurors was harmless.

We overrule Appellant's first and second issues.

### III. Admission of Certain Evidence During the Guilt/Innocence Phase

Appellant's buccal swabs were stored in an envelope that had several markings on it. These markings indicated that the buccal swabs were collected as evidence in an extraneous sexual assault that Appellant allegedly committed one year after the charged offense against the Complainant.

Outside the presence of the jury, and before the buccal swabs were ever admitted into evidence, the trial court commented that the markings were highly prejudicial. To avoid exposing Appellant to that unfair prejudice, the trial court determined that it would admit the envelope and the buccal swabs (assuming the proper predicate had been established), but not send either item back to the jury during deliberations. In the event that the jury asked to see the envelope or the buccal swabs, the trial court ruled "we will then deal with it then."

Later, when the trial resumed and the buccal swabs were offered into evidence, Appellant objected to the admission of the envelope on the basis of the prejudicial markings. The trial court overruled that objection. Appellant now challenges that ruling in his third issue on appeal.

For the sake of argument, we will assume without deciding that the trial court erred by admitting the envelope. The question then becomes whether the admission was reversible under the standard for non-constitutional error.

Non-constitutional error must be disregarded unless it affects a defendant's

10

substantial rights. *See* Tex. R. App. P. 44.2(b). An error affects a defendant's substantial rights when the error has a substantial and injurious effect or influence on the jury's verdict. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). If the error had no influence or only a slight effect on the verdict, then the error is harmless. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

There is no indication that the jury ever saw the envelope and it was not published during the trial. During deliberations, after the jury submitted a note requesting "to see all evidence as entered into court," the trial court issued the following response: "The Court is sending all of the evidence, absent the biological material. If you want to inspect it, please ask to inspect it." That response was consistent with the trial court's earlier ruling that it would not send the envelope back to the jury unless the jury specifically asked to inspect it. The record does not reveal that the jury ever replied with an additional request to inspect the envelope.

Because the record does not show that the jury ever saw the envelope and its prejudicial markings, we conclude that any error in the admission of the envelope had no influence on the jury's verdict, and therefore, the trial court's ruling was harmless.

We overrule Appellant's third issue.

## IV. Jury Instruction

During the charge conference, Appellant requested an instruction on the lesser-included offense of attempted sexual assault of a child and the trial court denied the request. In his seventh issue, Appellant challenges that refusal.

A trial court reversibly errs by denying a requested instruction for a

11

lesser-included offense if (1) the lesser offense is included within the proof required of the charged offense, and (2) there is some evidence from which a rational jury could acquit the defendant of the charged offense while convicting him of the lesser offense. *See Segundo v. State*, 270 S.W.3d 79, 90-91 (Tex. Crim. App. 2008).

Appellant has satisfied the first prong of this error analysis because an attempt is always included within the proof required of the charged offense. *See* Tex. Code Crim. Proc. Ann. art. 37.09(4).

To satisfy the second prong, there must be affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the charged offense. *See Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012). In other words, the evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense. *See Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000) (en banc). It is not enough that the jury may disbelieve crucial evidence pertaining to the charged offense. *See Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997).

Appellant believes that evidence of the lesser-included offense was raised via testimony from the sexual assault nurse examiner. He refers to two portions of the nurse's testimony, both arising out of her cross-examination. In the first portion, the nurse testified that seminal fluid can migrate from one place to another, meaning that the location of its discovery is not necessarily the same location as its original deposit. In the second portion, the nurse testified that she did not find any injuries on Complainant that were indicative of sexual assault. Based on these two lines of testimony, Appellant suggests that the jury could have rationally found that his seminal fluid made contact with Complainant by a means other than penetration, such as an attempt. We disagree.

12

The nurse's testimony does not constitute affirmative evidence that Appellant attempted, but failed, to penetrate Complainant's sexual organ. The testimony merely established that the nurse could not be completely certain whether the seminal fluid that was collected from Complainant was the product of a sexual assault. The nurse's uncertainty could have provided a basis for the jury to disbelieve crucial evidence pertaining to the charged offense, but her uncertainty did not raise affirmative evidence for purposes of the lesser-included offense. *See Massey v. State*, 933 S.W.2d 141, 155 (Tex. Crim. App. 1996) ("That a witness agrees that anything is possible and that he cannot be 100 percent certain of anything does not raise evidence for purposes of a lesser included offense."), *superseded on other grounds by statute*, Tex. Code Crim. Proc. Ann. art. 39.14, as recognized by *Watkins v. State*, 619 S.W.3d 265, 287-88 (Tex. Crim. App. 2021) ; *cf. Penaloza v. State*, 349 S.W.3d 709, 712-13 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (holding in an aggravated robbery case that a witness's testimony that she was uncertain as to whether the defendant had used a real gun or a toy gun did not raise affirmative evidence that a deadly weapon was not used, which was necessary to support the submission of the lesser-included offense of robbery).

We overrule Appellant's seventh issue.

## V.     Admission of Certain Evidence During the Punishment Hearing

In his eighth and ninth issues, Appellant cites Texas Rule of Evidence 702 and asserts the trial court erred by admitting certain evidence and testimony from DNA analyst Mary Symonds regarding an extraneous sexual assault. Appellant argues that, because Symonds was not present when the DNA evidence was processed by a separate laboratory, her expert testimony is unreliable.

In his tenth and eleventh issues, Appellant argues the trial court erred in admitting any evidence of the extraneous sexual assault because the only evidence

13

linking him to the assault — Symonds' testimony and laboratory report — were inadmissible.

We begin our analysis with Appellant's Rule 702 issues.

## A.      Standard of Review and Governing Law

We review a trial court's ruling on the admission of evidence for an abuse of discretion.  *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006).  The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably.  *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc).

Texas Rule of Evidence 702 governs the admissibility of expert testimony. *See* Tex. R. Evid. 702.  Under this rule, a witness who is "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Id*.  In sum, three requirements must be met before expert testimony can be admitted:  (1) the witness qualifies as an expert by reason of knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is appropriate for expert testimony; and (3) admitting the expert testimony will assist the fact-finder in deciding the case.  *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019).  "These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance." *Id*.  "*All three criteria must be proven to the trial court*, outside the presence of the jury, before the evidence may be admitted."  *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) (en banc) (emphasis in original).

Our analysis here focuses on the "reliability" prong.  For scientific evidence,

14

the burden is on the proponent to persuade the trial court through clear and convincing evidence that the proposed evidence is reliable. *Somers v. State*, 368 S.W.3d 528, 536 (Tex. Crim. App. 2012); *see also* 2 Steven Goode & Olin Guy Wellborn III, *Texas Practice: Texas Rules of Evidence* § 702.5 (4th ed. 2020) ("Unless the proposed evidence is supported by appropriate validation, it cannot qualify as 'scientific knowledge' . . . . Therefore, admissibility of scientific evidence requires a showing that it is based on scientifically valid principles."). This burden is met by showing that (1) the underlying scientific theory is valid, (2) the technique applying the theory is valid, and (3) the technique was properly applied on the occasion in question. *Somers*, 368 S.W.3d at 536 (citing *Kelly*, 824 S.W.2d at 573). In evidentiary matters, a trial court is a gatekeeper, ensuring expert testimony is relevant and based on a reliable foundation. *See In re J.R.*, 501 S.W.3d 738, 748 (Tex. App.—Waco 2016, no pet.).

In determining reliability, the trial court also may consider the following nonexclusive list of factors: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such community can be ascertained; (2) the existence of literature supporting or rejecting the underlying scientific theory and technique; (3) the clarity with which the underlying scientific theory and technique can be explained to the court; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the qualifications of the expert testifying; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Somers*, 368 S.W.3d at 536.

Based on these authorities, we disagree with our dissenting colleague's opinion that, "The question for this court to decide is whether the State's DNA evidence was actually reliable." Instead, the question for this court to decide is

15

whether the trial court abused its discretion when it permitted the State to introduce expert testimony despite (1) the absence of evidence tending to show said testimony was reliable, and (2) the fact that the trial court never took judicial notice said evidence was reliable.

## B.    Evidence

Ten witnesses testified at the punishment phase of Appellant's trial, six of whom were called by the State.  The jury heard first from Deputy Medina, a print examiner.  After examining Appellant's pen packet, Deputy Medina testified that Appellant previously had been convicted of passing a forged check and burglary of a habitation.  Also admitted during Deputy Medina's testimony were court documents showing Appellant previously had been convicted of prostitution and assault, family violence.

The jury heard next from Complainant, who testified about the impact of (and her difficulties stemming from) the sexual assault.

The State's other four witnesses testified about an extraneous sexual assault involving Appellant and Rebecca that allegedly occurred in October 2010.[1]

According to Rebecca, she was staying at a hotel in southwest Houston when she walked to a nearby convenience store to buy cigarettes.  Rebecca testified that a man driving an SUV stopped near her and offered her a ride to the store, which she accepted.  Rebecca said she was not wearing her contacts at the time and could not recall what the man looked like.

Rebecca said the man drove her to another location and raped her. According to Rebecca, the man also threatened her with a knife and told her "he'd kill [her] if [she] didn't cooperate."  Rebecca said the man eventually dropped her

---

[1] We use a pseudonym to refer to the victim in this case.

16

off at her hotel, and she ran inside and asked the front desk to call 911. According to Rebecca, an ambulance took her to a nearby hospital where she underwent a sexual assault examination.

Dana Oldham, the sexual assault nurse examiner, examined Rebecca at the hospital. Oldham read Rebecca's account of the sexual assault from the notes in the medical record, which was similar to Rebecca's testimony at trial. Oldham said that, during the exam, Rebecca was "crying" but "cooperative." Oldham's post-exam impressions were "[s]trangulation and sexual assault, per patient history." Oldham also collected DNA evidence from Rebecca and some of her clothing for further testing.

Detective Baker testified about her investigation into the October 2010 assault on Rebecca. Detective Baker said she was assigned to the case in 2017 and developed Appellant as a suspect. According to Detective Baker, Rebecca was presented with a photo array of six suspects, which included Appellant's picture. Rebecca did not identify Appellant as the suspect but instead chose another individual.

Symonds, a DNA analyst at the Houston Forensic Science Center, testified about the testing done on the evidence recovered from Rebecca and her clothes. According to Symonds, the DNA testing process utilized at the Houston Forensic Science Center includes four steps: (1) extraction, in which the DNA material is isolated in a cell; (2) quantification, which involves counting the amount of DNA material recovered; (3) amplification, whereby copies of the relevant DNA material are made; and (4) graphing the amount of DNA material and its location. Describing the fourth step further, Symonds said:

> And the fourth step — so all of those locations are tagged with fluorescent color and we run it through the fourth step and it creates,

17

like, a little graph for us to look at and that's where I come in and I analyze that graph and its different colors and it's separated out and I'm able to draw conclusions from that final graph.

Symonds said Rebecca's sexual assault kit was received by the Houston laboratory, which "did a screening and made portions of the items in the kit." Rebecca said those portions were sent to Bode Laboratories, an "accredited laboratory" located in Virginia. According to Symonds, Bode undertook the four-step testing process on the evidentiary portions from Rebecca's sexual assault kit and developed DNA profiles. Symonds said the "raw data" from these analyses were "processed via software to become an electropherogram." Summarizing this process, Symonds agreed that "Bode had the raw data, they process[ed] it into an electropherogram, and then [Symonds] look[ed] at the electropherogram and ma[de] sure [Bode] made the right calls."

Symonds described Bode as "another forensic lab that was contracted by our lab to process, [to] help get multiple amounts of kits processed for us. So they do the same thing that our lab does." Symonds said contracting with Bode was part of a project aimed at reducing the backlog of sexual assault kits in the Houston laboratory. Symonds testified that the process to choose Bode as the outsourcing laboratory involved on-site visits, reviewing Bode's operating procedures, ensuring Bode was in compliance with national standards, and staff interviews.

Symonds said she took "ownership of [the] evidence that was processed at Bode" and ensured the data was "in accordance, or in compliance, with their operating procedures." Describing this process, Symonds testified that she:

> went through with another checklist and basically ma[de] sure that those four steps that we do in our lab, [Bode] completed, as well, with the same standards that we set. We have controls set up throughout all of those steps to make sure that if something did go wrong, we would be able to detect that and make note of it and go back and

correct if there were any quality control issues. And so those steps are set up along the way; so I would go through, check all of their data, check all of their worksheets, and make sure that they had everything signed and dated and filled in where it should've been filled in.

Symonds acknowledged that she was not at Bode when the testing was done but said she was able to "determine whether or not anything had gone wrong in the testing."

In her review of Bode's data, Symonds said she identified a DNA profile suitable for comparison to Appellant's buccal swabs. For the sperm fraction of the profile, Symonds concluded that Appellant could not be excluded as a possible contributor to the DNA profile.[2] Likewise, for the non-sperm fraction of the profile, Symonds also concluded that Appellant could not be excluded as a possible contributor to the DNA profile.[3] These findings were included in Symonds' laboratory report, which was admitted into evidence.

On cross-examination, Symonds said she had never visited Bode's laboratory. Symonds testified that Bode's report was submitted by Amanda Mendoza. Symonds said Mendoza was the "one who looked at the electropherogram and made the calls at Bode as to what alleles were present."[4] Symonds said she would then "go back" over Mendoza's conclusions and "either

---

[2] Specifically, Symonds said the probability that a randomly chosen, unrelated individual would be included in this portion of the DNA profile was one in 12 sextillion for Caucasians, one in 88 sextillion for African Americans, one in 12 sextillion for Hispanics, and one in 110 sextillion for Asians.

[3] Specifically, Symonds said the probability that a randomly chosen, unrelated individual would be included in this portion of the DNA profile was one in 230 billion for Caucasians, one in 180 billion for African Americans, one in 130 billion for Hispanics, and one in 190 billion for Asians.

[4] "An allele is one member of a pair of genes occupying a specific position on a chromosome that controls the same trait or inheritance characteristic." *Jessop v. State*, 368 S.W.3d 653, 667 n.10 (Tex. App.—Austin 2012, no pet.).

agree or disagree."

Symonds said she did not know Mendoza or have any personal knowledge regarding Mendoza's qualifications. When asked whether Mendoza had the proper training and qualifications necessary to undertake the DNA testing, Symonds said she did not know but would "assume" she did.

According to Symonds, Bode could have assigned different people to complete each of the four steps in the DNA testing process. Symonds said she did not know who at Bode completed those steps.

Symonds also testified that she did not have any personal knowledge regarding whether Bode's instruments used for the DNA testing process were properly calibrated. When asked whether she had "actually seen any of [Bode's] internal protocols" or had "any personal knowledge of [Bode] actually following those protocols," Symonds replied, "[b]esides their signatures, no." Symonds said she did not have any knowledge regarding Bode's protocols for the storage of biological specimens or its procedures to maintain the chain of custody.

Appellant called four witnesses, three of whom were his family members. Appellant also called Officer Ballard, who responded to a call from Rebecca in July 2008. After meeting with Rebecca, Officer Ballard concluded he "didn't feel that [Rebecca] was being 100 percent forthcoming with the information that she was giving me." No further details were given with respect to the type of call Officer Ballard responded to on this occasion.

After the close of evidence, the jury assessed Appellant's punishment at imprisonment for 60 years.

## C.    Application

Before delving into the merits of Appellant's Rule 702 issue, we address the

20

State's contention that this argument was waived. To preserve a complaint regarding the admission of evidence, a defendant must lodge a timely, specific objection, and that objection must comport with the defendant's complaint on appeal. *See* Tex. R. App. P. 33.1(a)(1)(B), Tex. R. Evid. 103(a); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012).

Before the punishment hearing, Appellant filed an "Objection to Surrogate Testimony by Houston Forensic Science Analyst Mary Symonds Regarding DNA Tested by Bode Technology Pursuant to the Confrontation Clause and Texas Rule of Evidence 702." The first paragraph of Appellant's objection states, in relevant part:

> [Symonds'] opinion and testimony violate Texas Rule of Evidence 702 as the witness has no knowledge as to how Bode conducted their DNA testing, or whether the person who did the testing was qualified to do it or whether he or she did it correctly. This means the reliability prong of Texas Rule of Evidence 702 cannot be met with regard to Ms. Symonds['] expert opinions.

Before Symonds testified at the punishment hearing, Appellant's counsel renewed his objections under the Confrontation Clause and Texas Rule of Evidence 702. Appellant's counsel referenced the written objection filed with the trial court and reiterated that Symonds "should not be allowed to testify as to testing done by Bode." The trial court overruled Appellant's objections to Symonds' testimony.

The State argues that "[a]n objection that covers three subsets of analysis that in turn branches into up to seven different factors is not specific enough to preserve error in regard to 'reliability.'" We disagree with this characterization of Appellant's objection. Appellant's written objection under Texas Rule of Evidence 702 and his reiteration of that objection at the punishment hearing clearly challenge the reliability of Symonds' testimony and assert she lacked personal

21

knowledge regarding Bode's DNA testing. This objection comports with Appellant's argument on appeal. Therefore, Appellant properly preserved the issue for appellate review. *See* Tex. R. App. P. 33.1; Tex. R. Evid. 103(a); *Clark*, 365 S.W.3d at 339.

Turning to the merits of Appellant's issue, we conclude the trial court abused its discretion by admitting Symonds' testimony.

The law governing this issue is clear. To be admissible, scientific evidence must be reliable; to be reliable, the proponent of the evidence must show that the scientific technique "was properly applied on the occasion in question." *Somers*, 368 S.W.3d at 536 (citing *Kelly*, 824 S.W.2d at 573); *Coleman v. State*, 440 S.W.3d 218, 226 (Tex. App.—Houston [14th Dist.] 2013, no pet.). This showing must be made by clear and convincing evidence. *Somers*, 368 S.W.3d at 536; *Coleman*, 440 S.W.3d at 226.[5]

*Hines v. State*, 38 S.W.3d 805 (Tex. App.—Houston [14th Dist.] 2001, no pet.), illustrates the type of evidence that satisfies this showing. There, the

---

[5] Our dissenting colleague opines that the "panel opinion was fully consistent with the decisions from the Court of Criminal Appeals", but we hold the opinion directly conflicts with our precedents because it permitted the State to introduce expert testimony despite its failure to show the scientific technique at issue was sufficiently reliable. *See Coleman*, 440 S.W.3d at 226 ("For expert testimony to be admissible under this rule, the party offering scientific expert testimony must demonstrate, by clear and convincing evidence, that this testimony is sufficiently reliable and relevant to assist the factfinder in reaching accurate results."); *see also Corley v. State*, 541 S.W.3d 265, 267-68 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("To show that the expert's opinion would be helpful, the party offering the scientific proof, among other things, must demonstrate by clear and convincing evidence that the proof is reliable.") (citing *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000)); *Kolb v. State*, 523 S.W.3d 211, 218 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) ("For expert testimony to be admissible, 'the proponent of the expert scientific evidence must demonstrate by clear and convincing evidence that the testimony is 'sufficiently reliable and relevant to help the jury in reaching accurate results.'") (quoting *Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017) (quoting *Kelly*, 824 S.W.2d at 572)); *Wooten v. State*, 267 S.W.3d 289, 301 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) ("The proponent of scientific evidence must prove its reliability by clear and convincing evidence.").

appellant argued that the trial court erred in admitting DNA test results linking him to the offense because the State failed "to demonstrate that proper protocol had been followed during [the] DNA extraction process." *Id*. at 808. Overruling this argument, we noted that the DNA analyst who performed the DNA extraction testified at trial and discussed the extraction protocols applicable to the processes. *Id*. The DNA analyst "repeatedly affirmed . . . that proper protocol had been followed and that no cross-contamination or cross-labeling had occurred." *Id*. Concluding that the showing required by Rule 702 was met, we held that the trial court properly admitted the DNA testimony. *Id*. at 808-09; *see also Ashby v. State*, 527 S.W.3d 356, 364 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (Rule 702's reliability showing made where the testifying expert asserted that he followed the applicable protocols in testing the appellant's blood for the presence of a controlled substance); *Wooten v. State*, 267 S.W.3d 289, 301 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (Rule 702's reliability showing made where the medical toxicologist testified that, "in analyzing appellant's blood sample, he implemented the same techniques he learned in his week-long training by the Dade company in using the machine").

The Beaumont Court of Appeals similarly analyzed a case where, as here, the appellant challenged the DNA analyst's testimony on reliability grounds because the analyst "did not perform all aspects of the DNA testing." *See Dreyer v. State*, No. 09-09-00422-CR, 2011 WL 193494, at *4-5 (Tex. App.—Beaumont Jan. 19, 2011, no pet.) (mem. op., not designated for publication). But although the analyst in *Dreyer* did not perform the four-step DNA extraction process, she did work in the laboratory where the process was undertaken. *Id*. at *5. On this point, the analyst testified that (1) the laboratory takes a "team approach" and that "everyone follows the same training program"; (2) all the laboratory work was

23

subject to an internal validation process; (3) "the lab takes steps to ensure that contamination does not occur during the DNA testing"; and (4) the workstations in the laboratory were "cleaned before and after each use with a bleach cleaner." *Id.* Accordingly, the court held that the trial court did not abuse its discretion by overruling the appellant's objection to the DNA analyst's testimony. *Id.*[6]

In contrast to these cases, the record here does not contain any evidence showing that, when the DNA evidence was processed by Bode, the applicable scientific techniques were properly applied. In her testimony, Symonds described the four-step DNA testing process, which includes (1) extraction, (2) quantification, (3) amplification, and (4) graphing. Symonds said these steps were performed at Bode's Virginia laboratory but she did not know who at Bode completed these steps. Symonds said she did not have any personal knowledge regarding whether Bode followed its internal protocols in the completion of the processes and did not know whether Bode's instruments were properly calibrated. Symonds testified that she did not have any personal knowledge regarding Bode's protocols for the storage of biological specimens or its chain of custody procedures.

Symonds said Bode's final report was signed by Amanda Mendoza, who "looked at the electropherogram and made the calls at Bode as to what alleles were present." At this point in the process, Symonds said, she would "go back" over Mendoza's conclusions and "either agree or disagree" with them. Symonds testified that she did not know Mendoza or have any personal knowledge regarding Mendoza's qualifications. "For an expert's testimony based upon forensic analysis

---

[6] Our dissenting colleague opines that we believe "*Dreyer* establishes a minimum standard for reliability, which the current case fails to meet because Symonds did not work for Bode[.]" We do not; instead, we believe *Dreyer* is persuasive authority, we agree with its reasoning, and we establish the minimum standard for reliability in this court via this en banc opinion.

performed solely by a non-testifying analyst to be admissible, the testifying expert must testify about his or her own opinions and conclusions. While the testifying expert can rely upon information from a non-testifying analyst, the testifying expert cannot act as a surrogate to introduce that information." *Paredes v. State*, 462 S.W.3d 510, 517-18 (Tex. Crim. App. 2015).[7]

Despite her minimal personal knowledge of relevant facts concerning Bode, Symonds was the only sponsoring witness of the DNA evidence at issue. The trial court abused its discretion when it admitted this evidence precisely because it was already inadmissible as a matter of law. *See id.* at 518; *see also id.* at 514 ("As we observed, the testifying lab supervisor in *Burch* had no personal knowledge of the specific tests used to determine that the seized substance was cocaine as detailed in the lab report because she did not observe or perform any analysis."); *In re S.E.W.*, 168 S.W.3d 875, 883 (Tex. App.—Dallas 2005, no pet.) (Turnage, an analyst, had no knowledge of how the tests were performed, the protocols used for the instruments, whether those protocols were followed, and whether a standard was run before or after the tests; "the actual results of the scientific tests are the relevant

---

[7] *See Williams v. Illinois*, 567 U.S. 50, 91 (2012) (Breyer, J., concurring) ("Lower courts and treatise writers have recognized the problem. And they have come up with a variety of solutions. The New Wigmore, for example, lists several nonexclusive approaches to when testifying experts may rely on testing results or reports by nontestifying experts (*i.e.*, DNA technicians or analysts), including: . . . (4) permitting a DNA analyst to introduce DNA test results at trial without having 'personally perform[ed] every specific aspect of each DNA test in question, provided the analyst was present during the critical stages of the test, is familiar with the process and the laboratory protocol involved, reviews the results in proximity to the test, and either initials or signs the final report outlining the results'; [and] (5) permitting the introduction of a crime laboratory DNA report without the testimony of a technician where the 'testing in its pre-liminary stages' only 'requires the technician simply to perform largely mechanical or ministerial tasks . . . absent some reason to believe there was error or falsification'[.]") (citing David H. Kaye, David P. Bernstein & Jennifer L. Mnookin, *The New Wigmore: A Treatise on Evidence*, §§ 4.10.2, 4.10.3 (2d ed. 2010) (internal quotation marks and footnote omitted); *id.* at § 4.11.6); *Burch v. State*, 401 S.W.3d 634, 637 (Tex. Crim. App. 2013) (defendant was deprived of the opportunity to challenge witness's testimony because witness "could not verify that the results were properly generated").

evidence of drug use in this case. Turnage was the sponsoring witness for the test results . . . . Turnage's 'opinion' that the samples tested positive for cocaine was beyond the scope of his expertise and based entirely on the written report he received from the laboratory in Nevada. Thus he did not have expertise concerning the actual subject about which he offered his expert opinion.") (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex. 1998)).[8]. The State cannot escape its burden to establish reliability via clear and convincing evidence simply by producing a surrogate witness with minimal knowledge of relevant facts.

Compared to *Hines* and *Dreyer*, the evidence here falls well short of establishing that the DNA testing and analysis done by Bode was properly applied on the occasion in question. Therefore, because the State did not satisfy its burden of showing by clear and convincing evidence that its DNA evidence was reliable, the trial court erred by overruling Appellant's objection on this point.

Finally, the dissent opines that Appellant's challenges must fail because the trial court could have taken judicial notice that DNA analysis is widely accepted. We reject this results-based interpretation of an unambiguous rule that would result in the denial of clearly established constitutional protections. *See Garner v.*

---

[8] Although we acknowledge our dissenting colleague's reliance upon the Texas Court of Criminal Appeals' recent decision in *Molina v. Texas*, 632 S.W.3d 539 (Tex. Crim. App. 2021), the instant case is materially distinguishable therefrom. First, *Molina* dealt with the Confrontation Clause as opposed to reliability under Texas Rule of Evidence 702; here, Appellant's Confrontation Clause argument was inadequately briefed and was therefore waived. Second, the Court of Criminal Appeals' opinion in *Molina* held the expert therein to be sufficiently reliable because "[i]f Reliagene had not gathered this data in a scientifically reliable manner," he "would not expect a profile to be generated." *Id.* at 545. Here, there is no such testimony. Instead, when Symonds was asked whether she had "any personal knowledge of [Bode] actually following [its] protocols," she replied, "[b]esides their signatures, no." Our dissenting colleague further opines that our decision creates an "untenable" conflict with *Molina*; again, however, *Molina* is based on the Confrontation Clause while the instant opinion is concerned with Texas Rule of Evidence 702.

*Louisiana*, 368 U.S. 157, 173 (1961).[9]  When the trial court took judicial notice, it expressly notified the parties;[10] therefore, the trial court was unquestionably aware of how judicial notice operates and we decline the dissent's invitation to alter said operation in a manner that leads to the violation of clearly established constitutional rights.

---

[9] "There is nothing in the records to indicate that the trial judge did in fact take judicial notice of anything.  To extend the doctrine of judicial notice to the length pressed by the respondent would require us to allow the prosecution to do through argument to this Court what it is required by due process to do at the trial, and would be 'to turn the doctrine into a pretext for dispensing with a trial.'  Furthermore, unless an accused is informed at the trial of the facts of which the court is taking judicial notice, not only does he not know upon what evidence he is being convicted, but, in addition, he is deprived of any opportunity to challenge the deductions drawn from such notice or to dispute the notoriety or truth of the facts allegedly relied upon. Moreover, there is no way by which an appellate court may review the facts and law of a case and intelligently decide whether the findings of the lower court are supported by the evidence where that evidence is unknown.  Such an assumption would be a denial of due process." (quoting *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 302 (1937)).  *Cf.* Tex. R. Evid. 201(e) ("On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed.  If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard."); *Nunu v. Risk*, 567 S.W.3d 462, 469 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (Christopher, J.) ("As for Paul's assertion that he had no opportunity to address the propriety of the trial court's judicial notice, the Texas Rules of Evidence provide that, '[o]n timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed.'") (citing Tex. R. Evid. 201(e)); *In re C.L.*, 304 S.W.3d 512, 515 (Tex. App.—Waco 2009, no pet.) (holding that if a court takes judicial notice *sua sponte*, "it must at some point notify the parties that it has done so and give them an opportunity to challenge that decision") (citing *In re Graves*, 217 S.W.3d 744, 751 (Tex. App.—Waco 2007, orig. proceeding); *Tranter v. Duemling*, 129 S.W.3d 257, 262-63 (Tex. App.—El Paso 2004, no pet.); and *McDaniel v. Hale*, 893 S.W.2d 652, 673 (Tex. App.—Amarillo 1994, writ denied)).  Although this court has previously refused to follow *In re C.L.*, we have done so on the basis that a trial court may take judicial notice of the record without a request.  *See In re A.W.B.*, No. 14-11-00926-CV, 2012 WL 1048640, at *3 (Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.).

[10] 7 RR 146-47 ("Q. For reference, what's the population of Earth?  A. I think last time I checked, it was about 7.8 billion.  Q. Okay.  A. No, that seems low.  That might be Houston. Hold on.  I wrote it down.  Oh, yeah.  The Earth's population, 7.7 billion.  Houston is 2.2 billion. THE COURT:  Houston is not 2.7 billion.  THE WITNESS:  It's at 2.7 now?  THE COURT: Million. THE WITNESS: Oh, million?  Did I write it wrong?  THE COURT:  Houston is a big place, but it's not a billion.  I'll take judicial notice of that, and let's move on.").

**D. Harm**

The erroneous admission of evidence is non-constitutional error we analyze for harm pursuant to Texas Rule of Appellate Procedure 44.2(b). *See* Tex. R. App. P. 44.2(b); *Johnson*, 967 S.W.2d at 417. Rule 44.2(b) provides that an appellate court must disregard non-constitutional error that does not affect a criminal defendant's "substantial rights." Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). Non-constitutional error is harmless if the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations. *Id*. "If the reviewing court is unsure whether the error affected the outcome, that court should treat the error as harmful." *Fox v. State*, 283 S.W.3d 85, 95 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd).

For this analysis, we examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence. *Id*.; *see also Torres v. State*, 424 S.W.3d 245, 260 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). We analyze "any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002). The burden to demonstrate whether the appellant was harmed by trial court error does not rest on either the appellant or the State. *Coble*, 330 S.W.3d at 280.

Here, the erroneous admission of Symonds' testimony and laboratory report affected Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). First, this testimony and report provided the foundation for the extraneous sexual assault involving Rebecca — an offense similar to the one involving Complainant. This

28

extraneous assault was the focus of the State's evidence at the punishment hearing and was addressed by four of its six witnesses. *See Wisenbaker v. State*, 860 S.W.2d 681, 691 (Tex. App.—Austin 1993, pet. ref'd) (erroneous admission of extraneous offense harmful where it "constituted a large part of the punishment-phase evidence and implicated appellant in a history of conduct very closely analogous to the offense charged").

Second, of these four witnesses, only Symonds' testimony linked Appellant to the assault. Rebecca said that, at the time of the assault, she was not wearing her contacts and could not recall what the man who assaulted her looked like. Detective Baker testified that, while she was working on Rebecca's case, she developed Appellant as a suspect. However, when a photo array including Appellant's picture was presented to Rebecca, Detective Baker said Rebecca did not identify Appellant as the suspect but chose another individual. Accordingly, Symonds' testimony was the only evidence that would enable the State to meet its burden concerning the introduction of an extraneous offense during the punishment hearing. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (evidence of an extraneous crime or bad act is inadmissible unless "it is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible"). Therefore, the erroneous admission of this evidence was harmful.

Moreover, the State in its closing argument repeatedly discussed Rebecca's sexual assault and its similarities to the offense involving Complainant. Drawing on this comparison, the State argued that Appellant was a "serial rapist" who "pick[s] up women and prey[s] on them." This emphasis on Rebecca's sexual assault and its role in the State's closing argument further underscores our conclusion that the erroneous admission of Symonds' testimony harmed Appellant.

*See, e.g., Mosley v. State*, 931 S.W.2d 670, 677 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (erroneous admission of extraneous offense evidence harmful where, in his closing argument, the prosecutor "referred to several of the extraneous offenses and told the jury to 'think long and hard' before it returned anything less than life in prison").

Finally, Appellant was sentenced to imprisonment for 60 years based on improperly admitted evidence. Under the circumstances, we find it impossible to conclude said error was harmless.

We sustain Appellant's remaining issues and conclude (1) the trial court erred by overruling Appellant's Rule 702 objection to Symonds' testimony and evidence, and (2) this error affected Appellant's substantial rights.

CONCLUSION

We affirm the trial court's judgment on guilt. We reverse the judgment as to punishment and remand the case to the trial court to stand as if a new trial had been granted on punishment. *See* Tex. Code Crim. Proc. Ann. art. 44.29(b).


/s/      Meagan Hassan
          Justice


En Banc Court consists of Chief Justice Christopher and Justices Wise, Jewell, Bourliot, Zimmerer, Spain, Hassan, Poissant, and Wilson. Justice Hassan authored the Substitute En Banc Majority Opinion, which Justices Bourliot, Zimmerer, Spain, and Poissant joined. Chief Justice Christopher authored the Substitute En Banc Dissenting Opinion, which Justices Wise, Jewell, and Wilson joined.

Publish — Tex. R. App. P. 47.2(b).